Michael J. Agoglia (SBN 154810)
Rachel A. Naor (SBN 284966)
ALSTON & BIRD LLP
560 Mission Street, Suite 2100
San Francisco, California 94105
Telephone:   (415) 243-1000
Facsimile:    (415) 243-1001
michael.agoglia@alston.com
rachel.naor@alston.com

Attorneys for Defendant
M&T Bank

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA SILVEIRA, on behalf of herself and all other similarly situated,<br><br>        Plaintiff,<br><br>     v.<br><br>M&T Bank,<br><br>        Defendant. | Case No. 2:19-cv-06958-ODW-KS<br><br>**M&T BANK'S JOINDER IN PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**<br><br>Hon. Otis D. Wright, II |

## **TABLE OF CONTENTS**

I.     INTRODUCTION................................................................................1

II.    BACKGROUND..................................................................................1

III.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ..........4

    A.    The Amount and Distribution Method of the Common Fund Fairly, Reasonably and Adequately Compensates Class Members...........................................................................................4

        1.    Per the Court's Specific Requests, M&T Confirms that Plaintiff's Representations About the Class Size, Convenience Fees, and Common Fund Are Accurate. ..............4

        2.    The Financial Terms of the Settlement Are Fair, Reasonable, and Adequate, Especially When Balanced Against the Significant Risks Plaintiff Faces in Further Litigating this Case. ...........................................................4

        3.    Participating Class Members Will Get Paid in Strict Proportion to the Percentage of Convenience Fees They Actually Paid. .........................................................................7

    B.    The Court's Concerns Regarding the Parties' Notice Plan ...................8

    C.    Plaintiff's Request for Attorneys' Fees and an Incentive Award........12

IV.    CONCLUSION ................................................................................13

1

# <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                                                **Page(s)**

3

*In re Bond*,

4
   2004 U.S. Dist. LEXIS 33770 (C.D. Cal. Aug. 9, 2004) ....................................7

5
*Campbell v. Facebook, Inc.*,

6
   951 F.3d 1106 (9th Cir. 2020) .................................................................................5

7
*Garcia v. NationStar Mortg., LLC*,

8
   No. 15-cv-01808-TSZ (W.D. Wa.) .......................................................................7

9
*Lish v. AmeriHome Mortg. Co., LLC*,

10
   2020 U.S. Dist. LEXIS 215172 (C.D. Cal. Nov. 10, 2020) ..............................5, 6

11
*McWhorter v. Ocwen Loan Serv.*,

12
   2019 U.S. Dist. LEXIS 232149 (N.D. Ala. Aug. 1, 2019)...................................7

13
*Montesi et al. v. Seterus, Inc.*,
   No. 2015CA010901 (Palm Beach Cty., Florida) .................................................7

14

15
*Reid v. Ocwen Loan Serv., LLC*,
   No. 20-CV-80130-AHS, 2020 U.S. Dist. LEXIS 79378 (S.D. Fla.

16
   May 4, 2020).........................................................................................................5

17
*Sanders v. LoanCare, LLC*,

18
   No. 2:18-cv-09376-PA-RAO (C.D. Cal.)..........................................................6, 7

19
*Turner v. PHH Mortg. Corp.*,

20
   467 F. Supp. 3d 1244 (M.D. Fla. 2020) ............................................................5, 6

21
**Other Authorities**

22
Fed. R. Civ. P. 23(c)(2)(B) ......................................................................................12

23
Federal Judicial Center, *Judge's Class Action Notice and Claims*

24
   *Process Checklist and Plain Language Guide* (2010) ........................................10

25

26

27

28

M&T BANK'S JOINDER IN PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY APPROVAL

# I.    <u>INTRODUCTION</u>

Defendant M&T Bank hereby joins plaintiff Lisa Silveira's concurrently filed amended motion for preliminary approval of the parties' proposed nationwide class settlement of this action.  M&T submits this joinder to separately address certain issues and concerns raised by the Court in its order denying preliminary approval, and to express its independent views as to why the settlement meets the requirements for preliminary approval.

# II.    <u>BACKGROUND</u>

M&T is a state-chartered bank headquartered in Buffalo, New York.  Its primary regulators are the Federal Reserve and the New York Department of Financial Services.  Among other banking products and services, M&T services mortgage loans, both those it originated as well as loans originated by other lenders. The servicing of mortgages generally involves the collection and application of borrowers' monthly payments, the communication with borrowers and investors who may own the rights to those payments, assisting borrowers with loss mitigation efforts (*e.g*., forbearances, modifications), and, where necessary, efforts to collect and undertake the steps required by the governing law and contracts to administer defaults.  M&T has distinguished itself, even through the prior financial crisis, as being well-managed and conservative in its practices.  Among other things, this compliance focus saw M&T avoid the types of regulatory and other legal actions pursued against other mortgage servicers.

M&T offered borrowers throughout the Class Period[1] many different ways to make a mortgage payment.  These included both electronic payment channels, in

---

[1] Per the Settlement Agreement, the Class Period is defined as August 9, 2015, through the date of preliminary approval.  But, because the class is defined by loans on which borrowers paid a Convenience Fee (referred to herein as "Class Loans"), and because as of March 2020 M&T voluntarily stopped charging Convenience Fees, the size of the class and total Convenience Fes paid are now fixed and definite.  (*See* Declaration of Christopher Kieser in Support of M&T Bank's Joinder in Plaintiff's Amended Motion for Preliminary Approval of Class Settlement ("Kieser Decl.") at ¶¶ 4-6.)

which the payment is transferred to M&T electronically or over the phone, and non-electronic payment channels, such as when a borrower mails a physical check to M&T as payment, or makes a payment in-person at one of M&T's branch locations. The only payment method for which M&T has ever charged a fee during the Class Period is the Convenience Fee charged where a borrower paid by phone.  (*See* Declaration of Claudia Heath in Support of M&T Bank's Joinder in Plaintiff's Amended Motion for Preliminary Approval of Class Settlement ("Heath Decl.") at ¶¶ 2, 4, 8.)  Again, M&T did not assess borrowers any fee for making a payment online.[2]  (*Id.* ¶ 8.)

At no point did M&T ever require borrowers to use the phone pay method. (*Id.* ¶¶ 4, 5.)  Instead, M&T offered borrowers many different ways to make a monthly loan payment without cost.  (*Id.*)  Over the course of the Class Period, mortgage payments to M&T came in through the following channels, and roughly in the following percentages:

     a.  36% used M&T's web application which allowed borrowers to make mortgage payments through a one-time draft out of a deposit account they designated;

     b.  21% used a scheduled automatic withdrawal from the borrower's bank deposit account (known as an ACH transaction).  The deposit account could have been with M&T or another banking institution of the borrower's choice.

     c.  13% of borrowers used another form of automated payment similar to ACH, but rather than M&T reaching out to transfer scheduled funds from the borrower's designated account, the borrower

---

[2] The proposed settlement class defined in the parties' settlement agreement refers to fees charged to borrowers for making a payment by "telephone, IVR, or the internet," which is the same class definition alleged in the Complaint.  The parties used this definition at settlement for the sake of keeping that definition consistent with the class definition in the Complaint.  As stated above, no member of the settlement class ever paid a Convenience Fee in connection with making a mortgage payment online.

scheduled an automatic withdrawal to be sent from his or her deposit account at another institution to M&T.  These payments often are part of a bill-paying service arranged through the borrower's other financial institution.

d.  13% of borrowers paid their mortgages by mailing a check to M&T.

e.  5-6% of borrowers paid their mortgages by phone.  For these transactions, they could have completed the payment by speaking with a live customer representative, or by using M&T's automated Interactive Voice Recognition ("IVR") system to do so while on the phone.

f.  4% of borrowers paid their mortgages in person at an M&T branch.

g.  2% of borrowers used web banking to transfer money from their M&T checking account into their M&T mortgage account, and roughly .1% of borrowers paid their mortgage by sending money to M&T using Western Union.

h.  The remaining 7% of payments came in through an assortment of electronic and non-electronic means.

(*Id.* ¶ 6.)

Not only was payment by phone relatively rare as a percentage of mortgage payment methods used, of those borrowers who chose to pay their mortgages by phone over the Class Period, 42% did so on ***only one*** occasion.  (Kieser Decl. ¶ 7.) The average number of times Convenience Fees were paid on any Class Loan was just six times.  (*Id.*)

Finally, borrowers were never charged a Convenience Fee without their knowledge.  Borrowers who opted to make loan payments by phone were first informed about the associated Convenience Fees, and so proceeded with that payment method only after they knew the fee would be imposed.  (Heath Decl. ¶ 5.)

Indeed, this has never been a case where fraud was alleged or inferred. The class members were not "duped" into paying for something unwittingly. Instead, the core of plaintiff's allegations is that regardless of the fact that Convenience Fees were disclosed, such fees were nevertheless unlawful because they allegedly were not specifically authorized in the customers' underlying loan agreements. (Complaint [Dkt. 1] ¶¶ 2-3, 29-33.)

### III.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

#### A.   The Amount and Distribution Method of the Common Fund Fairly, Reasonably and Adequately Compensates Class Members.

##### 1.   Per the Court's Specific Requests, M&T Confirms that Plaintiff's Representations About the Class Size, Convenience Fees, and Common Fund Are Accurate.

The proposed settlement is in the form of a non-reverting common fund in the amount of $3,325,000. During the Class Period, there were a total of 110,871 loans on which Convenience Fees were paid. (Kieser Decl. ¶ 6.) The total amount of Convenience Fees paid by borrowers on those Class Loans was $9,581,409.20.[3] (*Id.*) Accordingly, the common fund does in fact represent 34.7% of the total Convenience Fees paid by class members during the Class Period.

##### 2.   The Financial Terms of the Settlement Are Fair, Reasonable, and Adequate, Especially When Balanced Against the Significant Risks Plaintiff Faces in Further Litigating this Case.

M&T submits that the financial terms of this settlement are well within the range of fair, reasonable and adequate to justify preliminary approval under Federal Rule of Civil Procedure 23(e). The settlement was in every sense the product of arms-length bargaining. Counsel for M&T have many decades of experience litigating mortgage-specific putative class actions, and plaintiff's counsel are also very experienced in this area. The parties utilized the services of one of the

---

[3] The Class Loan and total Convenience Fee counts are both net of transaction where the Convenience Fee was previously reversed or credited back to the borrowers. (*Id.*)

preeminent mediators, the Honorable Edward Infante (Ret.), in no small part to ensure that the course of negotiations would be vigorously but ethically pursued. Reaching agreement took considerable effort, including substantial exchanges of information about M&T's practices, the class size, and Convenience Fees actually paid. The parties appeared twice for all-day mediation sessions before Judge Infante, and engaged with the mediator remotely on several other occasions. M&T estimates that during the negotiation and drafting of the settlement, the parties independently conducted approximately a dozen conference calls between counsel to discuss factual and legal issues and to address elements of the potential settlement.

The fairness, reasonableness, and adequacy of the settlement must also include an assessment of the alternative available to the class. Indeed, in evaluating the fairness of the settlement, the Court should consider the risk, expense, complexity and likely duration of further litigation. *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020). M&T respectfully submits that, if the parties did not reach a settlement and continued to litigate this case, plaintiff and the putative class would face the very real threat of having some or all of her claims dismissed. That risk is not just theoretical. A number of courts—including Judge Walter in this District—have recently dismissed with prejudice similar claims that a servicer's convenience fees violated the FDCPA, corollary state debt collection statutes, or other laws. *See, e.g., Lish v. AmeriHome Mortg. Co., LLC*, 2020 U.S. Dist. LEXIS 215172 (C.D. Cal. Nov. 10, 2020) (Walter, J.) (dismissing with prejudice plaintiff's claims that defendant's convenience fees violated the Rosenthal Fair Debt Collection Practices Act, California's Unfair Competition Law, the Florida Consumer Collection Practices Act, and breached the terms of her mortgage contract); *Turner v. PHH Mortg. Corp.*, 467 F. Supp. 3d 1244 (M.D. Fla. 2020) (dismissing with prejudice plaintiff's claims under the FDCPA and FCCPA); *Reid v. Ocwen Loan Serv., LLC*, No. 20-CV-80130-AHS, 2020 U.S. Dist. LEXIS

79378 (S.D. Fla. May 4, 2020) (same).

These courts have concluded that the convenience fees charged by the servicer were not debts owed another as contemplated by the FDCPA and state debt collection practices act. *See, e.g.*, *Turner*, 467 F. Supp. 3d at 1247. Some of these courts have found that even if the fees were properly considered "debts," they were charged in connection with optional payment services that originated with the servicer—not with the plaintiff's mortgage. *Id.* at 1247-48; *Lish*, 2020 U.S. Dist. LEXIS 215172, at *7. Additionally, these courts have relied on the fact that when the plaintiff became obligated to pay the convenience fees, the plaintiff was not in default of his or her obligation to pay it. *See Turner*, 467 F. Supp. 3d at 1248; *Lish*, 2020 U.S. Dist. LEXIS 215172, at *12. According to these courts' analyses, the servicer was not acting as a debt collector under the acts because (1) the debt was not in default and (2) the debt originated with the servicer, and therefore the plaintiff did not allege any violation of the relevant acts.

There are, of course, a number of earlier decisions from around the country that came out more favorably for plaintiffs challenging convenience fees. But the existence of this substantial legal uncertainty with respect to the merits of plaintiff's claims is a significant factor in favor of approval. At a minimum, if litigated, these claims would have been the subject of dispositive motion practice before this Court, and experience, financial strength and incentives would very likely compel any losing party to take these many unsettled issues to the Ninth Circuit. So, even if successful in pursuing her claims and certifying a nationwide class, if this case were not settled, plaintiff and the class would in all likelihood have to wait three or more years before they saw any actual recovery.

Finally, the financial terms of this settlement fall squarely within the range of convenience fee settlements previously reached and readily approved in many other cases—including *Sanders v. LoanCare, LLC*, No. 2:18-cv-09376-PA-RAO (C.D. Cal.), a case in which Judge Percy Anderson of this District granted final approval

- 6 -

on December 4, 2020, to a class settlement with a very similar common fund and notice plan (*see* Dkt. 115); *see also see also McWhorter v. Ocwen Loan Serv.*, 2019 U.S. Dist. LEXIS 232149 (N.D. Ala. Aug. 1, 2019); *Garcia v. NationStar Mortg., LLC*, No. 15-cv-01808-TSZ (W.D. Wa.) (approving certification of nationwide classes). In *Sanders*, the $3,400,000 common fund represented 38.64% of the total fees collected from class members. In *Garcia*, the common fund represented 33% of the total amount of fees collected from class members. In addition to these federal court actions, a class settlement of a Florida class was finally approved in *Montesi et al. v. Seterus, Inc.*, No. 2015CA010901 (Palm Beach Cnty., Florida), where the common fund represented a 36.4% recovery.

As confirmed by the accompanying sworn declarations, the parties' settlement here represents 34.7% of the total Convenience Fees collected from class members. The fact that this settlement compares favorably to other similar settlements is persuasive evidence that the financial terms here are within the range of fair, reasonable and adequate such that preliminary approval is warranted. *See In re Bond*, 2004 U.S. Dist. LEXIS 33770, at *44-45 (C.D. Cal. Aug. 9, 2004) (fact that settlement compared favorably to other settlements demonstrated that it was fair, adequate, and reasonable).

### 3. Participating Class Members Will Get Paid in Strict Proportion to the Percentage of Convenience Fees They Actually Paid.

All class members who choose not to opt out will receive a payment from the common fund. There is no requirement that they submit a claim or otherwise qualify to receive settlement benefits. Instead, settlement funds will be distributed to class members using a pro rata method that will apportion payment based on the amount of fees paid by each class member. M&T respectfully submits that this is objectively the fairest way to distribute benefits under the settlement.

Under this distribution, each class member (or set of co-borrowers on a single loan) who does not opt out of the settlement will receive a portion of the fund

that represents the actual percentage of the total convenience fees paid by the borrower (or set of borrowers) on that loan.  In other words, if the Convenience Fees a borrower paid over the Class Period amounted to 1% of the total Convenience Fees, then that borrower would be allocated 1% of the net settlement fund.[4]

A pro rata distribution is especially appropriate here given the range of Convenience Fees paid by class members.  Again, 42% of the borrowers with Class Loans paid only one Convenience Fee, which was typically $15.  (Kieser Decl. ¶¶ 7-8.)  The average amount of Convenience Fees paid on the Class Loans was $86.  (*Id.* ¶ 8.)  These class members will get a recovery consistent with their relatively small alleged injury.  Conversely, those few borrowers who routinely paid their mortgages by phone and who thus paid more in total convenience fees than most class members will receive a proportionately greater share of the fund.[5]  In sum, the parties have accounted for the range in the amount of fees paid by any particular class member by choosing a distribution method that compensates class members based on the amount of fees actually paid.

## B.    The Court's Concerns Regarding the Parties' Notice Plan

M&T provides the following additional details of the proposed notice plan and form of class notice to address the Court's concerns.

### 1.    Use of M&T's Logo on the Class Notice Form

The class notice submitted by the parties for the Court's consideration did not contain M&T's logo because, consistent with the overwhelming practice in class settlements under Rule 23, the notice was consciously designed to look like a

---

[4] As in almost all common fund settlements, the actual dollar amounts paid to each class member will ultimately depend on how much the Court awards in attorney fees and costs, and incentive award to plaintiff, as well as the costs of settlement administration.  All of those will be deducted from the $3,325,000 starting amount to obtain the net settlement funds available for distribution.  The actual dollar amounts distributed to each class member will also depend on how many class members elect to opt out of the settlement.

[5] According to M&T's records, the highest amount of convenience fees paid by any borrower during the Class Period is $939.00.  (Kieser Decl. ¶ 8.)

neutral communication from the Court, rather than a marketing or other communication from M&T.  The parties also canvassed the experience of their proposed settlement administrator, who has a great deal of experience in creating and implementing notice plans for class settlements.  (*See* Declaration of Cameron R. Azari in Support of M&T Bank's Joinder in Plaintiff's Amended Motion for Preliminary Approval of Class Settlement ("Azari Decl.") at ¶¶ 1, 10-12.)  Consistent with the conventional approach to having the class notice appear as a court-approved disclosure of the class member's rights and consequences of participating in the settlement, the settlement administrator confirmed that it is very uncommon for a class notice to display the logo of the defendant, except for the rare instance in which the defendant wants to include it.  (*Id.* ¶ 11.)  Where logos have been used on class notices, it has more commonly been the logo of the court approving the notice and overseeing the approval process.  (*Id.*)

So that this Court is in a position to determine whether to include a logo with the class notice and, if so, which one, the parties have asked the settlement administrator to provide mockups of the class notice with M&T's logo and the Court's logo.  (*See* Azari Decl. ¶ 12, Exhibits A & B.)  The parties have no objection to implementing whichever form of class notice the Court deems best.

### 2.     Sending Class Notice by Email

The parties originally proposed to send the class notice by US mail.  The Court has asked the parties to address providing notice by email.  M&T provides the following information to assist the Court in deciding the best approach to effect actual notice to the class members.

The parties selected US mail as the method of delivering class notice because US mail is still considered the most reliable way to reach class members.  On this topic, the Federal Judicial Center currently advises the federal judiciary as follows:

> If available, parties should use postal mailing addresses, which are generally more effective than e-mail in reaching class members: mail-forwarding

services reach movers, and the influx of 'SPAM' e-mail messages can cause valid e-mails to go unread.

Federal Judicial Center, *Judge's Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010).

That US mail is considerably more reliable than email notice in circumstances such as here has also been the real-world experience of the settlement administrator.  (Azari Decl. ¶¶ 3-9.)  There are numerous reasons for this.  First, if class notice is delivered by US mail, and the address provided to the administrator for any particular class member is incorrect, the correct address can very likely be located through the National Change of Address ("NCOA") database before class notice is mailed.  (*Id.* ¶ 6.)  Here, the parties' settlement agreement requires that the administrator update the addresses provided by M&T for class members through the NCOA before sending out class notice.  (Agreement [Dkt. 21-1, Ex. A], § 6.3.1.)  Once an address is updated through the NCOA database, it is very likely to be delivered.  (Azari Decl. ¶ 6.)  Conversely, if the email address provided to the administrator for any particular class member is incorrect, the administrator does not have any way to locate the correct email address.  (*Id.* ¶ 7.)  Stated differently, unlike US mail, there is no address forwarding that is available for email addresses that are no longer in operation.  This problem is exacerbated where older email addresses are at issue.  (*Id.*)

Second, spam filters frequently catch class notices, rendering it less likely for a class notice to be delivered to a class member's inbox.  This is in part because spam filters have robust mechanisms for detecting mass mailings, and when a class notice is delivered by email, it must be done through a mass mailing.  (*Id.* ¶ 8.)  As a general matter, spam filters have only become more robust over time, especially in response to concerns about privacy and unsolicited contacts.  (*Id.*)  On the other hand, the fact that a class notice sent by US mail is done by mass mailing has no effect on whether or not it is ultimately delivered.  (*Id.*)  For all these reasons, M&T

understands that US mail, rather than email, is considered the gold standard in delivering class notice.

A further impediment to using email to reach class members in this case is that M&T has not required borrowers to provide email addresses. (Heath Decl. ¶ 9.) Instead, throughout the Class Period, M&T has relied primarily on US mail to communicate with the class members. (*Id*.) In fact, many of the governing loan documents require M&T to communicate important notices by US mail. (*Id*.) The US mailing addresses for class members here are, if anything, much more intrinsically reliable than other customer mailing lists because they relate to home loans, typically on the class members' primary residences. Class members have strong incentives to keep M&T apprised of the best mailing addresses for them, and M&T regularly updates its mailing addresses for its mortgage servicing customers. (*Id*. ¶ 13.)

While M&T has collected emails from some of its customers, particularly more recently to address pandemic-related issues such as forbearances, significant differences exist between categories of class members. Of the 110,871 Class Loans, 39% are no longer serviced by M&T. (Kieser Decl. ¶10.) M&T does not have any email address for 58% of those former customer class members. (*Id*. ¶ 11.) By contrast, M&T has an email address for 87% of the Class Loans which are still being serviced. (*Id*. ¶ 12.)

Finally, while class notice certainly could be sent out here by both US mail and the available email addresses M&T has for class members, the parties want to flag a potential problem such duplicative notice may cause. The settlement provides that for loans for which there is more than one borrower, a timely opt-out by any co- or joint borrower on that loan will be effective as to all borrowers on that loan. (*See* Agreement § 11.2.) Of the approximately 110,871 Class Loans, over 41,000 have multiple borrowers. (Kieser Decl. ¶ 6.) Sending US mail notice is highly likely to reach the home where those co-borrowers live, or some other US

mail address to which they have directed such notices to be sent. For that reason, mail notices are more likely to provoke collective decision-making by co-borrowers over whether to opt out. Emails, on the other hand, are addressed to individual borrowers, and therefore carry a greater risk of separate action by co-borrowers. For example, a parent or relative who signed on to the loan might be very differently disposed to participation in the class settlement than borrowers who live at the property. Emails to the former present materially greater risk that disputes will later arise between co-borrowers precisely because email notice made independent borrower decision-making more probable.

For all the above reasons, M&T believes that sending the notice by US mail remains the best means of effecting actual notice to class members, and does so without unduly creating disputes that will have to be refereed at a later date. M&T, like plaintiff, also defers to the Court's judgment about what notice plan meets the "best practicable under the circumstances" standard which governs this issue. *See* Fed. R. Civ. P. 23(c)(2)(B) ("the court must direct to class members the best notice that is practicable under the circumstances . . . .)

### C.    Plaintiff's Request for Attorneys' Fees and an Incentive Award

Plaintiff's Amended Motion separately addresses the Court's concerns regarding the amount of attorney fees and incentive award that plaintiff may seek. M&T weighs in on these topics only to make clear that the settlement agreement provisions regarding attorneys' fees and an incentive award are not in any way contingent on a specific dollar threshold being met. The settlement instead provides that the amounts paid out of the common fund to plaintiff as an incentive award and to her counsel in fees and costs will be determined by the Court.

1

## IV.   CONCLUSION

2

For all the foregoing reasons, and for the reasons set forth in plaintiff's

3

Amended Motion for Preliminary Approval of Class Settlement, M&T respectfully

4

submits that this settlement fully meets the requirements for preliminary approval.

5

6   DATED:  December 9, 2020                    Respectfully submitted,

7                                               ALSTON & BIRD LLP

8

9                                               /s/ Michael J. Agoglia

10                                              Michael J. Agoglia
                                                Rachel A. Naor
11                                              ALSTON & BIRD LLP
                                                560 Mission Street, Suite 2100
12                                              San Francisco, California 94105
                                                Telephone:   (415) 243-1000
13                                              Facsimile:    (415) 243-1001
                                                michael.agoglia@alston.com
14                                              rachel.naor@alston.com

15                                              Attorneys for Defendant
                                                M&T Bank

16

17

18

19

20

21

22

23

24

25

26

27

28